UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES,** | 13-cr-0224 (KM) |
| v. | |
| **MUAMER ASAN,** | **OPINION** |
| **Defendant.** | |

**KEVIN MCNULTY, U.S.D.J.**

    The defendant, Muamer Asan, was convicted of one misdemeanor offense of public lewdness, in violation of 36 C.F.R. § 7.29(c). The offense was tried before a federal Magistrate Judge because it occurred at Sandy Hook, a federal enclave that is part of the Gateway National Recreation Area. *See* 18 U.S.C. § 13; *United States v. Hall*, 979 F.2d 320 (3d Cir. 1992). Because I have recently written on virtually the same subject,[1] I will repeat some of the material in my earlier opinion, but I will shorten the background discussion somewhat.

    On March 23, 2012, at Sandy Hook, Mr. Asan was issued a violation notice for public lewdness. On July 11, 2012, he had an initial appearance, at which he entered a plea of not guilty, and an Assistant Federal Public Defender Counsel was appointed counsel for him. (Magistrate Docket no. 12-mj-09135) On November 28, 2012, United States Magistrate Judge Anthony R. Mautone conducted a non-jury trial, at which the arresting park ranger and the defendant testified. After hearing the testimony and receiving exhibits, Magistrate Judge Mautone found Asan guilty. 1T 57-59.[2]

---

[1] In *United States v. Zombory*, I upheld the misdemeanor conviction of a person arrested by the same officer, on the same beach, at the same time, on the same day, for the same offense. No. 12-cr-717, 2013 WL 5970090 (D.N.J. Nov. 6, 2013). Mr. Asan's counsel conceded that Asan is the "John Doe" referred to at p.4 of the *Zombory* opinion. 1T 5. Of course the guilt, or not, of Mr. Asan is a wholly separate issue; I refer to *Zombory*, as did the parties, only as background.

[2] The transcript of trial, Document No. 19-2, is cited as "1T_". The transcript of sentencing, Document No. 19-4, is cited as "2T_." Citations to docket documents refer to the District Court file, unless the Magistrate Judge's file is specified.

A Presentence Report was prepared. On March 20, 2013, Magistrate Judge Mautone imposed a sentence of two years' probation, a two-year ban from Sandy Hook, a fine of $1000, and a special assessment of $10. 2T 7-9. Judgment was entered on April 2, 2013. Case12-mj-9135, Document no. 5. Asan filed a timely appeal to this Court. Document no. 1; see 18 U.S.C. § 3402; Fed. R. Crim. P. 58(g)(2)(B); L. Crim. R. 58.1(d)(1).

**EVIDENCE AT TRIAL**

The government's sole witness was Adam Hubert, a park ranger assigned to the Gateway Recreational Area.

The events in question occurred at about 3:00 p.m. on March 23, 2012. (1T 7). *See also* Violation Notice, Mag. No. 12-mj-9135 Document No. 1. The locale was Gunnison Beach, one of eight beaches at Sandy Hook. All agree that Gunnison is a clothing-optional beach, and that mere nudity would not have constituted a violation of any kind.

Adam Hubert, an experienced park ranger, was scanning Gunnison Beach through binoculars. (1T 7-8). Standing at the dune line of the beach, Hubert initially observed Thomas Zombory[3] from a distance of approximately 70 yards. Zombory was stroking his penis. (1T 8). Hubert began walking toward Zombory. The area through which he walked was sloped, with patches of dune grass at a height of about 12 inches. (1T 9-10)

Where the dune line ends and the beach begins, however, Hubert saw Mr. Asan. Asan was sitting in a beach chair by a retention fence that was nearly buried. (1T 10, 22) Hubert approached Asan from behind, to Asan's right. (1T 10, 18) From a distance of about three feet, Hubert looked over Asan's right shoulder. Asan appeared to be watching Zombory and/or Zombory's companion. Asan was nude from the waist down. He had his left hand on his penis and was stroking it back and forth.[4] (1T 10, 11, 25-26) Hubert had no further recollection as to the appearance or condition of the defendant's genitals. (1T 26)

---

[3] Although the transcript spells the name "Zambori," this person is clearly the same person named as a defendant and later convicted of public lewdness in *United States v. Zombory*, No. 12-cr-717. Shortly after approaching Asan, Hubert approached Zombory and gave Zombory a summons as well. Zombory, like Asan, claimed that he was not masturbating but applying lotion to his penis, and submitted in evidence a photographic re-creation of his wind screen setup. Zombory was accompanied by his fiancée, who was not charged with anything.

[4] In response to questioning by the court, some ambiguity emerged as to whether, in relation to a seated person, "up and down" would be a better description. (1T 26) The issue is not material, except perhaps as to the ranger's observations or powers of description.

2

No bushes, shrubs, tents or artificial structures obstructed Mr. Asan's position from the beach. To Asan's left, about ten yards away, was a person in a beach chair. To Asan's right, also about ten yards away, was another person in a beach chair. Zombory and his companion were about 25 yards away. Some other visitors were walking to and from the beach area. (1T 11) To the west of the fence by which Asan sat, however, was the dune area, from which the public was excluded. (1T 23)

Hubert counted about ten seconds. Asan had not stopped stroking his penis. Hubert then told Asan he was under arrest for public lewdness. Hubert was in full uniform; Asan was "startled," and said that he "wasn't doing anything." (1T 12) Hubert did not see Asan applying sun tan lotion or any other ointment. (1T 12, 25)

Hubert told Asan to dress and pack his belongings, and Asan complied. At some point (the timing is a little unclear), Asan said he had been applying suntan lotion to himself. (1T 19)[5] Taking Asan with him, Hubert then walked over to Zombory. (1T 13)

The ranger's inventory of property reveals that, at the time of his arrest, Asan possessed a wallet, sunglasses, vehicle keys, beach items, Geritol, a beach screen, and $62 in cash. (1T 14; Govt' Ex. 1) The inventory was not necessarily exhaustive, however, and it did not state whether Asan possessed suntan lotion. (1T 19-20, 24-25) Asked about the beach screen, Hubert could not recall anything about its appearance or position. (1T 15, 17)

The sole witness for the defense was Mr. Asan himself.

Asan testified that he had been sitting in his beach chair with a fabric wind screen that "surrounds me almost." (1T 29) The court admitted in evidence a picture of the chair and screen, taken in Asan's back yard sometime after his arrest. (Def. Ex. 1; 1T 35) From his position, Asan testified, he could see "a couple people." (1T 35) Asan, who is 58, denied masturbating, stating that he had not done so since he was a teenager. (1T 36) In fact, he said, he was eating fruit when Hubert approached. (1T 36)

Asan testified that he had applied suntan lotion to himself. (1T 37) He acknowledged on cross-examination that it was March, and he was wearing a sweatshirt with a hood. (1T 45) He then said he had been applying the suntan lotion to his foot and other areas. (1T 46) On further questioning, Asan twice agreed that he had applied suntan lotion to "your feet, your ankles, your legs, your calves, your thighs and your penis." (1T 47, 48) Asan added that the

---

[5] According to Hubert, Asan also said that he had been "making pot holders." (1T 12)

3

ranger, approaching from behind, could not possibly have seen him applying suntan lotion. (1T 37-38)

Asan stated that his wind screen was in segments, each 10 feet long, and that he had it configured in an "L" shape that day (not a "U" that would surround, or almost surround, him). (1T 38) The two legs of the L were in front of Asan and to his right. (1T 40) Thus, he testified, he could be seen from the left or from behind, but not from the right or the front. (1T 41-42) Asan stated that he could see two people about 50 feet away, at the one o'clock position. (1T 42-43) When looking over the screen from the seated position, he could see people only from the chest up. (1T 50)

The Magistrate Judge admitted in evidence a photograph of the windscreen and chair. Asan took the photo in his back yard. (A copy of Exhibit D-1, the photo, is attached to defendant's appeal brief as Da-8. Document 13 at p.14.) The photograph was admitted for the limited purpose of depicting the wind screen; it was not, and was not offered as, a photograph of the scene at Gunnison Beach. (1T 31-35)

Asan testified that Hubert accused him of "watching those two and masturbating," or "playing with yourself and watching those two people." (1T 39, 51) Asan replied that he was "not doing anything." (1T 47) The ranger appeared to Asan to be "two minded" (undecided, of two minds) about arresting him. (1T 39-40)

**FINDINGS AND VERDICT**

Immediately before rendering his verdict, the Magistrate Judge heard the summations and arguments of counsel. (1T 51-57) During those arguments, he made comments and interjections that shed light on his conclusions. To some degree, I refer to them below in the discussion of the issues. This, however, was the Magistrate Judge's formal statement of the guilty verdict:

> THE COURT: I find beyond a reasonable doubt, in fact I don't have any doubt, that the Government has sustained its burden of proof in this case.
>
> And as damning to the Defendant as the testimony of the ranger was, his own testimony, which he chose to give, not being any – not being in any situation where he needed to do so, was as damaging to him as the testimony of the ranger.
>
> I don't believe a thing he said. And I admitted into evidence, even over the objection of the Government, this photograph, D-1 in evidence. I don't believe for a moment that this photograph, D-1,

4

depicts the wind screen and the position of the chair in the position that it was on the beach.

I understand the Defendant's explanation that he took it some time later. I understand that he took it in his yard. I understand that the yard shows that it's taken on grass, as opposed to the beach. But look at the way it's situated.

He wants us to believe, by showing us this photograph, that you can't see him. And he wants to bolster the argument of his attorney that he was trying to seclude himself from view, when just the opposite is the case, according to his testimony.

His testimony supports the testimony of the ranger. Remember that he said and even gestured, his original testimony on direct was that he had this wind screen on his left and behind him and to his right. And then he testified and further explained to the Court that he could see these other people on an angle at approximately a 1:00 angle to the right.

It's clear to me that the testimony of the ranger that as he approached the Defendant from behind him on the Defendant's right, that the Defendant neither saw him coming or cared about his approach and that the ranger was in a position to see what the Defendant was doing and that the Defendant was in a position, and I don't know whether he did or not and it's not relevant, but he was in a position to see the other two people on the beach and he admitted so in his testimony.

I have no doubt, and certainly no doubt beyond a reasonable doubt, that the ranger's testimony is credible and the Defendant's testimony is incredible and I find him guilty as charged.

(1T 57-59)

**DISCUSSION**

**I.   Sufficiency of the Evidence to Establish the Elements of the Offense**

**A. Standard of Review**

"In all cases of conviction by a United States magistrate judge an appeal of right shall lie from the judgment of the magistrate judge to a judge of the district court of the district in which the offense was committed." 18 U.S.C. § 3402; *see also* Fed. R. Crim. P. 58(g)(2)(B) ("A defendant may appeal a

5

magistrate judge's judgment of conviction or sentence to a district judge within 14 days of its entry."); *United States v. Pethick,* 513 F.3d 1200, 1201 (10th Cir. 2008). "The scope of review upon appeal shall be the same as an appeal from a judgment of the District Court to the Third Circuit." L. Crim. R. 58.1(d)(1) (D.N.J.); *accord United States v. Jackson,* 2008 U.S. Dist. LEXIS 46179 (D.N.J. June 11, 2008).

The standard of review on appeal from a judgment of criminal conviction after a bench trial is well-settled. On appeal after a nonjury trial, this Court will apply "de novo review to the legal determinations made by the [Magistrate Judge] and review ... factual findings for clear error." *United States v. Solorzano,* Crim. 06-922 JBS, 2008 WL 5451040 (D.N.J. Dec. 30, 2008). Plenary, or *de novo,* review of legal matters requires little comment. Clearly-erroneous review, too, is a familiar standard when a judge's findings of fact are at issue.[6] *See United States v. Orgovan,* 377 F. App'x 227, 229 (3d Cir. 1010) (not precedential); *United States v. Delerme,* 457 F.2d 156, 160 (3d Cir. 1972). A finding is clearly erroneous when "the court is left with the definite and firm conviction that a mistake has been committed." *Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir. 1972); *accord United States v. Howe,* 543 F.3d 128, 133 (3d Cir. 2008); *United States v. Igbonwa,* 120 F.3d 437, 440 (3d Cir. 1997). Under the clearly-erroneous standard, a judge's finding of fact must be upheld unless it "(1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *United States v. Antoon,* 933 F.2d 200, 204 (3d Cir. 1991) (quoting *Krasnov,* 465 F.2d at 1302).

As I observed in *Zombory,* law enforcement priorities are not for the Court to consider. The standard of review, moreover, compels me to affirm even if I, as fact finder, might not have reached the same conclusion. I review for clear error.

### B. Public Lewdness Under 36 C.F.R. § 7.29(c)

The federal regulation that Asan was found to have violated specifically applies to the Gateway National Recreation Area. It defines the offense of public lewdness as follows:

> Public lewdness. Section 245.00 of the New York Penal Code is hereby adopted and incorporated into the regulations of this part. Section 245.00 provides that: A person is guilty of public lewdness when he intentionally exposes the private and intimate parts of his

---

[6] This standard of review, while deferential, is more searching than the standard of review of a jury verdict, which is also cited by the government. *See, e.g., Jackson v. Virginia,* 443 U.S. 307, 318-19 (1979) (court may reverse only if no rational trier of fact could have found guilt beyond a reasonable doubt based on the available evidence).

6

    body in a lewd manner or commits any other lewd act (a) in a public place....

36 C.F.R. § 7.29(c).[7] Because this CFR section explicitly borrows New York state law, the case law interpreting NYPL § 245.00 is pertinent. *See United States v. Doe,* 884 F. Supp. 78, 82 (E.D.N.Y. 1995).

    Asan cites *People v. Gilbert,* 72 Misc. 2d 75, 338 N.Y.S.2d 457 (N.Y. City Crim. Ct., Kings Co. 1972), for the proposition that a violation of NYPL § 245.00 has four essential elements, *i.e.,* that defendant did

(1) intentionally,
(2) in a public place,
(3) expose the private or intimate parts of [his] body,
(4) in a lewd manner or commit any other lewd act.

72 Misc. 2d at 76 (line breaks added). I adopt that formulation.

### 1. Lewd Act

    Asan first contends that there was insufficient evidence to support the Magistrate Judge's finding beyond a reasonable doubt that he exposed himself in a lewd manner or committed a "lewd act." *Gilbert* holds that the definition of "lewd" encompasses "sexual impurity or incontinence carried on in a wanton manner" or acts "characterized by lust; lustful; carnal; licentious." 72 Misc. 2d at 77 (dictionary citations omitted). Asan does not seriously contest that public masturbation, even through clothing, is "lewd" conduct. *People v. Darryl M.,* 123 Misc. 2d 723, 726, 475 N.Y.S.2d 704 (N.Y. City Crim. Ct. 1984) (citing *People v. Clark,* 60 Misc. 2d 1073, 1074, 304 N.Y.S.2d 326 (Crim. Ct., N.Y.Co., 1969)). *See also People v. Horner,* 300 A.D.2d 841, 843, 752 N.Y.S.2d 147 (3d Dep't 2002).

    Mere nudity, and perhaps a bit more, is not lewd, and that principle is perhaps nowhere more pertinent than on a clothing-optional beach. "Nudity in itself and without lewdness or dirtiness is no obscenity in law or in common sense." *Matter of Excelsior Pictures Corp. v. Regent of Univ. of State of N.Y.,* 3 N.Y.2d 237, 242, 144 N.E.2d 31, 165 N.Y.S.2d 42 (1957). Thus in *Gilbert,* the court found no violation of NYPL § 245.00 where a nude and apparently

---

[7]     The reference in the text of 36 C.F.R. § 7.29(c), as the parties agree, is obviously to Section 245.00 of the New York Penal Law ("NYPL"). The portion omitted from the quotation goes on to provide "or (b) in private premises under circumstances in which he may readily be observed from either a public place or from other private premises, and with intent that he be so observed." This prosecution proceeded under subsection (a), and the government concedes that subsection (b) does not apply.

uninhibited defendant had sunned herself, applied suntan lotion to her breasts, and generally frolicked before clothed onlookers on a public beach. 72 Misc. 2d at 78.

Asan denies that he was masturbating at all. He states that he was doing nothing, or that he was applying suntan lotion to his penis. Under the clearly-erroneous standard of review, however, I must defer to the finder of fact.[8] The park ranger, Hubert, had ample opportunity to observe Asan, from a distance of just three feet. Hubert slowly counted to ten as he watched Asan stroke his penis. (The record will bear the interpretation that Asan was preoccupied at the time, watching Zombory and another person.) The month was March, and Asan was wearing a hooded sweatshirt on the top half of his body. Asan at various times stated that, when Hubert approached, he was not doing anything, or was eating fruit, or was applying suntan lotion. The ranger never saw suntan lotion, and that item did not appear in the (not necessarily complete) inventory of Asan's belongings.

In the Magistrate Judge's view, Asan's backyard re-creation of his wind screen setup hurt his credibility. It did not undermine the observations of Park Ranger Hubert, whom the Magistrate Judge believed.[9] More broadly, the Magistrate Judge credited Hubert's testimony and stated frankly that he did not believe Asan. That, as fact finder, he was entitled to do.

The Magistrate Judge's finding that a lewd act occurred is supported by the record. It is not clearly erroneous, the necessary threshold for reversal.

---

[8]  Asan heavily relies on the *Gilbert* court's statement of the reasonable-doubt standard. *See* Def. Br. at 22 (evidence must exclude every other reasonable possibility but guilt, must all be consistent with and point to guilt, and must be inconsistent with innocence) (citing *People v. Trimarchi*, 231 N.Y. 263, 267, 131 N.E. 910 (1921)). That is the standard of proof that the fact finder must apply in a criminal case. *See id.* There is no contention here that the Magistrate Judge failed to apply the standard of proof beyond a reasonable doubt. *See* 1T 57 ("I find beyond a reasonable doubt...."); 1T 59 ("I have no doubt, and certainly no doubt beyond reasonable doubt....").

That burden of proof, however, must not be confused with this Court's standard of review on appeal. The appellate standard of review of this criminal conviction after a bench trial is plenary as to legal matters, clear error as to the facts. *See* p. 2, *supra*.

[9]  Asan testified that the screen almost surrounded him, that it would have blocked the ranger's view, and that it was in an L shape, blocking the front and right but not the rear and left. The photo taken in Asan's back yard, admitted only as a depiction of the wind screen, has the screen in the front/right L configuration. The Magistrate Judge stated that Asan's testimony, supplemented by his gestures, indicated a different configuration. (1T 58) The issue is not critical. Even as presented in the photo, the screen would not seem to block observations over Asan's right shoulder from a few feet away. (Photo, Exhibit D-1, Document 13 at p. 14.)

8

### 2. Public place

Asan next contends that, as a matter of law, the evidence was insufficient to support a finding that his acts were committed in "a public place." Again, the evidentiary support is such that there is no clear error in the finding that the defendant was in a "public place" as a matter of law.

*People v. McNamara,* 78 N.Y.2d 626, 585 N.E.2d 788, 578 N.Y.S.2d 476 (1991), rejected a *per se* rule that any place within the boundaries of a public park is necessarily "public" for purposes of NYPL § 245.00. It also found defendant's intent to be irrelevant, but defined a public place in relation to a hypothetical unsuspecting or non-consenting viewer. 78 N.Y.2d at 633. Under *McNamara* a place is considered public "when the objective circumstances establish that the lewd acts committed there can and likely would be seen by the casual passerby." *Id.* at 633-34. *McNamara* does not require that defendant be seen; but he must be in a place where he could and likely would be seen.

Asan cites the reversal of a public lewdness conviction in *United States v. Doe,* 884 F. Supp. 78 (E.D.N.Y. 1995). In *Doe,* the defendant was charged with public lewdness after engaging in oral sex with another man in the Gateway National Recreation Area. *Id.* at 79. The park was not crowded; the investigating ranger saw only five people there the entire evening. The incident occurred at about 8:45 p.m., well after dark in April. The participants were well concealed in dense shrubbery, 50 feet from a parking lot and over 10 feet from a lighted bike path. *Id.* at 79-80. The location could not be seen from the path; even during daylight the area was apparently dark and shrouded in shrubbery. The investigating ranger saw the acts only because he penetrated the dense shrubbery looking for evidence of "homosexual behavior" or drug activity. *Id.* at 82. In short, these persons were hiding, not in a "public place." *Id.* at 82-83.

Magistrate Judge Mautone was well aware of the requirement that the portion of Gunnison Beach where Asan sat be a "public place." Just before rendering his verdict, he heard both counsel on the subject, and he discussed it with defense counsel. (1T 53-57) For example, he rejected counsel's argument that Asan's lewdness could not have been "public" because the only person (Zombory) who saw Asan was also engaged in a lewd act. He referred specifically to the interpretation of the statute in reference to the perspective of an "innocent passerby." (1T 54) That is consistent with the *McNamara* standard.

The factors that moved the court in *Doe* are not present here. In this case, the time, the location, and the extraordinary zealousness of the

investigators do not conspire, as in *Doe,* to suggest an invasion of a private, concealed enclave.[10]

On the contrary, there was ample evidence that Asan was viewable, if not actually viewed, by persons on the beach. By his own account, Asan was sitting on a public beach, concealed on only two of four sides by his L shaped wind screen.[11] The setting was an open, public beach in broad daylight at 3:00 in the afternoon. There was patchy beach grass, but not of a height or density that would obscure anyone's view. Hubert testified that no bushes, shrubs, tents or artificial structures concealed Mr. Asan's position from the beach. Hubert saw that, to Asan's left and right, about ten yards away, were two other people in beach chairs, and that Zombory was about 25 yards away. Other visitors were walking to and from the beach area. True, there was no testimony that they actually saw Asan masturbating, but that is not required. They were on the beach and there was nothing to prevent them from walking by.

Asan's conviction is based on sufficient evidence that lewd behavior occurred, and that it occurred in a place where it could be seen by a member of the public. The conviction is neither clearly erroneous as to the facts, nor mistaken as to the law.

## II.  Failure to Provide a Turkish-Language Interpreter

Asan, whose language of origin is Turkish, asserts that the Magistrate Judge erred in failing to provide him with a Turkish-language interpreter. That error, he says, resulted in a violation of his Fifth Amendment right to due process and Sixth Amendment right to effective assistance of counsel. Before the Magistrate Judge, however, the defendant and his counsel never asked for an interpreter or objected to the lack of an interpreter.

### A. Standard of Review

As stated above, when this Court reviews a criminal conviction before the Magistrate Judge, "[t]he scope of review upon appeal shall be the same as an appeal from a judgment of the District Court to the Third Circuit." L. Crim. R.

---

[10]   This record raises no questions like those suggested by the *Doe* officers' leafy quest for "homosexual behavior" or "male homosexuals." *See* 884 F. Supp. at 82-83.

[11]   Even on these two sides, Asan testified, he could look over the screen from a sitting position. It is unclear, however, to what extent an observer at various distances could see him over the screen (*see* 1T 44), so I do not consider this issue. Magistrate Judge Mautone was entitled to give minimal weight to Asan's photograph of his wind screen set-up. (Exhibit D-1, Document No. 13 at p. 14). This did not represent the scene at Gunnison Beach. It was a backyard re-creation, produced by Asan after he was charged, solely for the purpose of serving as evidence in his criminal case.

58.1(d)(1). This appeal is the first time Asan has ever raised the claim that he should have had an interpreter. On appeal to the United States Court of Appeals for the Third Circuit, a claim of error not raised in the trial court would be reviewed only for plain error. Fed. R. Crim. P. 52(b); *Government of Virgin Islands v. Rosa*, 399 F.3d 283, 293 (3d Cir. 2005); *see also United States v. Osuna*, 189 F.3d 1289, 1292 (10th Cir. 1999) (where defendant failed to request interpreter, issue reviewed on appeal only for plain error).[12]

The plain error standard has four critical elements:

[T]here must be (1) an "error" (2) that is "plain" and (3) that "affect[s] substantial rights." .... If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error ""seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.""

*Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal citations omitted). *Accord Henderson v. United States*, 133 S. Ct. 1121, 1126-27 (2013); *United States v. Olano*, 507 U.S. 725, 732 (1993).

### B. Failure to Appoint An Interpreter

Asan asserts his claim under the Fifth and Sixth Amendments to the U.S. Constitution. A better starting point for the analysis, however, is the Court Interpreters Act, 28 U.S.C. § 1827. The Act was passed, not to expand Constitutional rights, but to implement them. *See United States v. Johnson*, 248 F.3d 655, 661 (7th Cir. 2001); *see also United States v. Joshi*, 896 F.2d 1303, 1309 (11th Cir. 1990) ("the Court Interpreters Act ... does not create new constitutional rights for defendants or expand existing constitutional safeguards."). Whether the claim is made under the Constitution or the Act, "the basic constitutional inquiry remains unchanged." *Id. See also Osuna*, 189 F.3d at 1292; *Johnson*, 248 F.3d at 663-64. Thus, for example, the necessary showing for reversal of a conviction under the Act is whether the statutory violation made the trial fundamentally unfair—a standard that mimics the test for a due process violation.

Under the Court Interpreters Act, an interpreter will be appointed under the following circumstances:

... in judicial proceedings instituted by the United States, if the presiding judicial officer determines on such officer's own motion

---

[12] For a properly preserved claim, the Court of Appeals' standard of review of a District Court judgment would be abuse of discretion. *See United States v. Johnson*, 248 F.3d 655, 661, 663-64 (7th Cir. 2001) (statutory and Constitutional claims); *United States v. Febus*, 218 F.3d 784, 790 (7th Cir. 2000).

11

or on the motion of a party that such party (including a defendant in a criminal case) or a witness who may present testimony in such judicial proceedings—
> (A) Speaks only or primarily a language other than the English language ...

so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer, or so as to inhibit such witness' comprehension of questions and the presentation of such testimony.

28 U.S.C. § 1827(d)(1). The purpose of the Act "is to ensure that the defendant can comprehend the proceedings and communicate effectively with counsel." *Febus*, 218 F.3d at 791.

As I have said, the defense never requested or moved for appointment of an interpreter. The initial inquiry, then, is whether the trial court's failure to recognize, *sua sponte,* the need for an interpreter (or at least to inquire) constituted "error," and whether such error was "plain."

"Section 1827 does place on the trial court a mandatory duty to inquire as to the need for an interpreter when a defendant has difficulty with English." *Osuna*, 189 F.3d at 1292 (quoting *Valladares v. United States*, 871 F.2d 1564, 1565-66 (11th Cir.1989)). Indeed, it has been held that "[a]ny indication to the presiding judicial officer that a criminal defendant speaks only or primarily a language other than the English language should trigger the application of Sections (d) and (f)(1) of the Court Interpreters Act." *United States v. Tapia,* 631 F.2d 1207, 1209 (5th Cir.1980).

The trial court has wide discretion, however, in deciding whether and to what extent an interpreter is necessary, and its decision will reversed only for abuse of that discretion. *See Johnson,* 248 F.3d at 661; *Febus,* 218 F.3d at 791-93; *United States v. Payan Paz,* 981 F.2d 199, 200-01 (5th Cir. 1992) (selection of non-certified interpreter). Under the Constitution, the trial court also enjoys discretion. *Johnson,* 248 F.3d at 663. The Constitutional cases, however, seem to give more weight to the defendant's failure to object or properly alert the trial court to the need for an interpreter. *See id.* at 663-64 (citing *United States v. Carrion,* 488 F.2d 12, 14-15 (1st Cir. 1973); *United States v. Yee Soon Shin,* 953 F.2d 559, 561 (9th Cir.1992)).

The defendant, in pressing this issue, relies in part on facts in the Presentence Report. The government, which does not object, does the same. This is appropriate, in my view. First, of course, the parties consent. Second, although these facts were not necessarily known to the Magistrate Judge at the

12

time of trial, they certainly were known to him at the time of sentencing.[13] Thus they may bear on the issue of whether, however belatedly, the Magistrate Judge should have been alerted to Asan's alleged lack of proficiency in English.

Asan was born in 1955 in Macedonia, then part of Yugoslavia. His original language was Turkish. He has a high school education, and he served in the military. He married his wife in 1978 in Yugoslavia. Asan immigrated to the United States with his wife and son in 1989, at the age of 34. He lived in New York for a few years before relocating to New Jersey. He was naturalized as a US citizen at Newark in 1996. (PSR ¶¶ 18-20)[14]

Asan and his wife, who works as a chemist for a perfume company, live in Wayne, New Jersey. They have raised two children, both of whom attended college in the U.S., to adulthood. More than 20 years ago, Asan suffered a head injury when he fell from a scaffold on the job. He has been on disability ever since. He reports pain from the injury, has been medicated for anxiety that he believes is related to the injury, and says he has problems with memory and concentration. (PSR ¶¶ 19-24). Asan's brief on this appeal recites these facts from the PSR at greater length, citing each to the relevant paragraph of the report.

Then, however, the brief states that "[t]he defendant has a great deal of difficulty understanding the English language, particularly when he is nervous." It refers to his head injury and anxiety medication, stating that these, too hamper his "ability to understand the language." (Def. Appeal Br. at 8). These statements are not cited to the record. The record nowhere states that Asan has difficulty understanding or communicating in English.

The Presentence Report, as is customary, contains a great deal of information, much of it gleaned from an interview with the defendant. The probation officer who prepared the Presentence Report states in the Report that "the defendant was cooperative and communicated in a clear and logical manner." (PSR ¶ 24)

---

[13] At sentencing, the defense had only one, unrelated objection as to the accuracy of the statement of facts in the PSR. (2T 2)

[14] The government points out that naturalization on one's own application requires a demonstration of a basic "understanding of the English language, including an ability to read, write, and speak words in ordinary usage in the English language." 8 C.F.R. § 312.1. I do not consider this a guarantee of any particular level of proficiency, especially in regard to legal proceedings, but it may indicate a basic understanding of the language.

13

I proceed to the trial record. A key fact—and one that distinguishes this case from some others cited above—is that the defendant himself testified, at length and in English.

The brief for defendant quotes the beginning of the direct examination of Asan. (1T 28:2 – 29:3) There, counsel, the court, and Asan interrupted each other to some degree. The exchange that comes closest to expressing any difficulty with English is this:

> Q   So –
> A   Probably a male and female about 50 feet away.
> Q   The male --
> THE COURT:  Here, here, let me make sure I understand you clearly, sir, because you have a little bit of an accent and I want the record to be clear. You said probably a male and female about 50 feet away. Okay. Go ahead.

(1T 28:29 – 29:3) The Magistrate Judge states only that the defendant has an "accent." He makes sure that he understands the defendant accurately. I do not interpret this as a failure to communicate—rather the contrary.

Defendant's brief next points to several Q&A exchanges on cross-examination. Asan answered several questions "yes," without elaborating; counsel concludes that Asan must not have understood them. Particularly on cross-examination, there is nothing inherently suspicious about single-word affirmative answers. Nor is there anything about the content that raises a concern. These were leading questions about whether certain items appear in a photograph; they could hardly have been answered any other way.

The brief then quotes passages in which the Magistrate Judge questioned defendant. Again, the exchanges may reflect a certain lack of precision. That is not uncommon in lay testimony. (Def. App. Br. At 11-12, citing 1T 36-37) But they do not reflect inability to speak English. Defendant used the unidiomatic expression "two minded," to mean "undecided." The Court immediately understood Asan to mean "of two minds." (Def. App. Br. at 12-13, citing 1T 39-40) I do not agree that this demonstrates a "huge language barrier," as claimed.

There were further exchanges, in which counsel questioned Asan closely to establish exactly what he said, his physical position, and what he could see. The court followed up with clarifying questions, as is common. There are fragmentary questions and answers, but for the most part these reflect interruptions, not improper English. Counsel emphasizes a particular exchange, regarding the two people sitting near Asan:

> Q:   Could you see all of them or just part?
> A    <u>Just two</u>

14

(Def. App. Br. 14-16 (emphasis in brief), citing 1T 47-50) Counsel meant to ask what "part" of these people's bodies could be seen; Asan, however, understandably misinterpreted "all of them" to mean "all of the individuals." The misunderstanding was immediately cleared up. Asan answered the question as reformulated: he could see their heads when he was sitting, and more when he stood. The Court asked the question again, and Asan responded "this couple, I see them." To be sure, this stray fragment was not perfectly grammatical, but it does not indicate any essential misunderstanding.

The government points out that Asan generally answered the questions fluidly and cogently. In particular, he clearly stated the facts that constituted his defense to the charges:

> [AUSA]: Mr. Asan, you were – when the ranger approached, you were behind the wind screen, correct, in your chair?
> [Defendant]: Yes.
> [AUSA]: And when you sit in your chair and look out, could you tell the Court what you could see or what you could observe?
> [Defendant]: I see my wind screen, I see farther away the – what I call is – grass and farther away I see a couple people.
> [AUSA]: Now the range [sic] accused you of masturbating. Were you masturbating, Mr. Asan?
> [Defendant]: No, sir.
> [AUSA]: When was the last time you masturbated, Mr. Asan?
> [Defendant]: Never in my life. Only when I was a teenager.
> ...
> [AUSA]: How old are you, sir?
> [Defendant]: I am 58.
> [AUSA]: Were you looking at the couple that was, as you indicated, at some distance. Were you looking at them masturbating? Were you masturbating while you were looking at them?
> [Defendant]: No. No.
> [AUSA]: What were you doing when the ranger approached you, Mr. Asan?
> [Defendant]: Basically, I was eating couple of – I had – the bag with me, I had a couple apples, a banana, I have a couple apples.
>         [Non-substantive interruption by court]
> [AUSA]: Were you apply [sic] suntan lotion on you when the ranger approached?
> [Defendant]: I did apply suntan – suntan lotion, but exactly the time maybe was – facing behind me in that moment he saw me applying the suntan lotion.
> [AUSA]: But at that moment, you were not masturbating?
> [Defendant]: No.

15

(1T 35:2-37:2.)

The government notes also that Asan carefully described the claimed orientation of the wind screen, even correcting the questioner when the questioner misunderstood:

> [AUSA]: Mr. Asan, you've been talking about your wind screen and you said you had the wind screen situated in front of you and to your right or to your left?
> [Defendant]: In the front and there on my right.
> [AUSA]: Front and left. So –
> [Defendant]: Front and right.
> [AUSA]: Okay. So any individual who was a beach goer who was walking on your right would be able to see what you were doing in your chair, correct?
> [Defendant]: No. No.
> [AUSA]: Well, what would – what would – I'm sorry Mr. Asan.
> [Defendant]: You cannot see my right side.
> [AUSA]: Well, your screen was to your left and to the front of you, what was on your right side, sir?
> [Defendant]: Screen on the right, not the left.
> [AUSA]: Okay. Now the screen is to your front and to your right?
> [Defendant]: Yes.
> [AUSA]: I stand corrected. Anyone coming from your left side then would have been able to observe you and what you were doing, correct?
> [Defendant]: Yes. Yes.

(1T 40:15-41:13)

So did the Magistrate Judge err, or err plainly, by failing to inquire or find, *sua sponte*, that Asan "speaks only or primarily a language other than the English language ... so as to inhibit [his] comprehension of the proceedings or communication with counsel or the presiding judicial officer, or so as to inhibit such witness' comprehension of questions and the presentation of such testimony"? 28 U.S.C. § 1827(d)(1). I do not believe so.

To be sure, Turkish is Asan's native language. He was, however, approximately 58 years old at the time of trial and had lived in the United States for 24 years, most of that time in suburban Wayne, New Jersey. He was a naturalized citizen, who had raised two college-educated children here. There was no reason for the Court to assume that Asan "primarily" spoke Turkish in 2013; he had left Macedonia for good in 1989.

Defense counsel never expressed any difficulty in communicating with his client. He did not request an interpreter. That is not dispositive, but it does further suggest that Asan had no significant difficulty in communicating.

Defense counsel has pointed to what he regards as irregularities in the transcript. Most are garden-variety misunderstandings, some arising from the parties' speaking over each other, and all were remedied immediately. Occasional lapses from perfect grammar are common in transcripts, even when the witnesses are native English speakers. That Mr. Asan spoke with an accent is not unusual in our diverse society; it may reflect that he first learned English as a young adult, but it does not indicate any lack of fluency. The transcript contains no [unintelligible] designations, as in at least one cited case. *See Osuna*, 189 F.3d at 1293.

The Magistrate Judge asked clarifying questions. These, I find, were designed to ensure that he, as finder of fact, understood what the testimony consisted of. (The transcript of the factually parallel *Zombory* case, in which the defendant was a native English speaker, contains similar questioning.) It was appropriate to expand on verbal descriptions of physical facts, such as the location of the parties, or the hand motions from which the Ranger concluded that the defendant was masturbating. I do not find the Magistrate Judge's questioning to be emblematic of a problem with comprehension or expression; on the contrary, it tended to repeat and reinforce what was being said.

In contrast to the cases cited above, the presiding judicial officer here was also the finder of fact. The Magistrate Judge knew very well whether he was having trouble understanding the defendant. Thus we need not, for example, speculate as to whether a jury was able to comprehend him.

Finally, I add that these proceedings were not technical or complex. *See Johnson*, 218 F.3d at 791 (important factor is "complexity of the proceedings and testimony"). At issue was a single incident of lewd behavior in a public recreation area. The facts occurred over a period of seconds or minutes, and they all involved Asan himself. The trial included the testimony of just two witnesses, one of them Asan himself. From start to finish, including summations and delivery of the verdict, this misdemeanor trial occupied some 74 minutes.

Taking the broader view, I have reviewed the entire transcript. I see no particular cause for concern that Asan's ability to communicate or understand was inhibited. He answered questions appropriately. He stated his version of the facts.

In short, there is no plain error here. A "plain" error is a decision that is not just wrong, but clearly and obviously so. *See Henderson*, 133 S. Ct. at

1130; *Johnson*, 520 U.S. at 467. On the record before him, the Magistrate Judge did not violate any clear command of law when he failed to appoint an interpreter or to find, *sua sponte*, that Asan "primarily" speaks another language and was "inhibit[ed]" in his communication or comprehension in English. Further, I cannot find that any arguable error met the third plain-error requirement of "affect[ing] substantial rights." *Johnson*, 520 U.S. at 467. Such an error must have been "prejudicial," and must have "affected the outcome" of the proceeding. *Olano*, 507 U.S. at 734. Assuming, *e.g.*, that the trial judge failed to make a required inquiry as to the need for an interpreter, I see no indication that any prejudice resulted. Of course, I might find fundamental unfairness if Asan truly could not communicate or understand, but the record does not suggest that.

Finally, even if the first three conditions of plain error were met, I would not exercise my discretion to reverse, because any arguable error did not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 467. The record reveals a defendant who was well able to tell his story and understand the proceedings. Any error, assuming it were present, would not plausibly be seen as going to the fairness, integrity or reputation of these court proceedings.

In short, this case does not meet the four-part test for plain error. Out of thoroughness, I will state in the alternative that, even if the objection had been properly reserved, the record analyzed above would not have justified reversal on an abuse-of-discretion standard of review.

## CONCLUSION

For the foregoing reasons, the judgment of conviction entered by the United States Magistrate Judge is **AFFIRMED**. An appropriate order will be filed with this opinion.

Dated: March 10, 2014
Newark, New Jersey

_____
KEVIN MCNULTY
United States District Judge